## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **Juan Doe** | : |
| | : |
| Plaintiff | : |
| | : |
| | :    **Civil Action** |
| vs. | : |
| | : |
| **Delaware State University Board of Trustees,** | : |
| | : |
| **and** | : |
| | : |
| **Candy Young, in her individual capacity,** | : |
| | :    Jury Trial Demanded |
| | : |
| Defendants | : |
| | : |

## VERIFIED COMPLAINT AND JURY DEMAND

Juan Doe through his undersigned counsel, files this civil complaint against defendants the Delaware State University Board of Trustees ("DSU") and Candy Young ("Young"), sometimes identified together as "defendants", and in support avers as follows:

1.      Defendants deprived Plaintiff of his rights under Title IX to a sexual discrimination free, and under Title VI to a race discrimination free, academic environment and also violated his contractual rights concerning the events that took place after Jane Doe sexually assaulted plaintiff in the DSU campus where both were enrolled as undergraduates.  Throughout, defendants failed to adhere to laws, to the contract with plaintiff, and to defendant's policies which should have protected Plaintiff.

2.      This is the rare case in Delaware where a heterosexual man invokes the protection of his Title IX rights against a university as allowed under the 3rd Circuit's seminal decision in *Doe v. University of the Sciences* No. 19-2966 (3d Cir. 2020), which guarantees fairness to respondents of sexual misconduct; which DSU ignored.

## I.     THE PARTIES

3.      Plaintiff ("Juan Doe") resides in South Carolina, and is a heterosexual man of

Latino race and Mexican national origin.  Plaintiff was enrolled as a full student at DSU.

4.      Defendant Delaware State University Board of Trustees is the official governing

body of Delaware State University ("DSU") and is charged with operating and governing

DSU, a public, historically black college in Dover, Delaware.

5.      Defendant Candy Young ("Young") was at all times relevant, the Director of the

Title IX Office at DSU. Plaintiff is informed and believes and thereon alleges that as the

Director of the Title IX Office, Defendant Candy Young was responsible for participating

in making, communicating, enforcing, and implementing all policies and practices at

DSU with respect to Title IX, including insuring DSU's policies and procedures

concerning Title IX comply with federal law.

## II.     JURISDICTION AND VENUE

6.      Plaintiff invokes this Court's original jurisdiction under Title IX of the Education

Act Amendments of 1972, 20 U.S.C. §1681, et seq. and 28 U.S.C.§1331. 23; and because

of the race discrimination claim under Title VI of the 1964 CRA, 42 U.S.C. § 2000d et

seq.  For the claims against Young Plaintiff invokes this Court's original jurisdiction

under 42 U.S.C. § 1983 for her violations of Plaintiff's equal protection.

7.      Plaintiff also invokes jurisdiction under this Court's power to prevent

discrimination based on race as codified in 42 U.S.C. §1981 which specifically prohibits

against the use of race discrimination in the enforcement of contracts in the United States.

8.      Plaintiff invokes this Court's equitable powers under 28 USC §2201.

9.      Pursuant to 28 U.S.C. §1391, venue for this action properly lies in this district because a substantial part of the events or omissions giving rise to the claims set forth below occurred in this judicial district.

10.     Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C.§1367. 25.

### III FACTS

**A.      Jane Doe Grooms and Harasses Juan Doe in Violation of DSU Policy:**

11.     Juan Doe, a first generation college student, chose to attend DSU, a Historically Black College, because DSU promised him "fairness and equity in all aspects of the educational enterprise" which includes no discrimination "on the basis of race, hearing status, personal appearance, color, sex, pregnancy, political affiliation, source of income, place of business, residence, religion, creed, ethnicity, national origin (including ancestry), citizenship status…" (Ex. 1).

12.     Specifically, DSU promised Juan Doe a "thorough, reliable and impartial" sexual misconduct resolution process through specific policies and procedures which Juan agreed to study and behave under because they protect him from sexual misconduct as well as from race and gender biases in their implementation and enforcement.  (Ex. 1).

13.     Those policies include DSU's "Policies and Procedures: Equal Opportunity, Harassment and Non-discrimination".  (Ex. 1).

14.     As Juan, a former athlete, worked out in DSU's Wellness and Recreation Center, a black female student, Jane Doe, introduced herself to him and started making

unwelcome conversation including guessing his weight, and stating details about Juan

Doe that would have been known to someone who had been watching him for a while.

15.     For example, during that initial conversation and for no reason at all, Jane Doe

described for Juan what she thought was his "ideal woman" and then provided an exact

description of Student No. 1, the DSU Latina student with whom Juan has a relationship.

16.     Jane engaged in additional behavior that Juan now believes groomed him to

become the victim of her sexual assault and hostility.

17.     Juan Doe has described in exacting detail in Exhibit 2 how he was victimized

under Jane Doe's sexually harassing, predatory, or grooming behavior including:

•       "During the Fall 2019 semester [Jane Doe], DSU '23, started a series of

sexually hostile encounters during gym class at DSU which I found made it

impossible for me to enjoy or learn in that class as [Jane's] sexual innuendo was

severe enough that it forced me to let her know that I was not attracted to a

woman of her dimensions."

•        "On one occasion, I was wearing a tight blue spandex T-shirt for working

out and [Jane] was staring at me the whole time that I practiced my wrestling

routine in the gym. Her stalking made me uncomfortable"

**B.     Jane Doe Sexually Assaults Juan Doe at DSU in Violation of DSU Policy:**

18.     On the night of November 15-16, 2019, Jane contacted Juan via text and asked

him to invite her to a private party with Juan's friends at their dorm.

19.     As Juan Doe has described in exacting detail (Ex. 2) he was sexually assaulted by

Jane Doe later that night:

- "[Jane] then got me drunk and forced me to accept her company. She insisted on sitting next to me and on blocking my friends away. She engaged in continuous and unwelcome requests that I go with her somewhere private. [Jane] specifically asked me "can I tell you a secret?" and she said "I want to have sex with you"."

- "As soon as the door closed I was standing in the middle of the room, which was spinning, trying to not throw up because walking had made my drunkenness worse. [Jane] then came up to me and started kissing me in the mouth by putting her tongue into my mouth. She never asked permission to do this."

- "And then [Jane] fondled my penis with her left hand and then put it in her mouth, once again, without my permission."

- "Then [Jane] got her right hand on my penis and put it into her vagina. I couldn't really thrust in. I was too embarrassed and I wanted this to end."

20. After this, Jane Doe had DSU Police, a private force employed by DSU, arrest Juan Doe on a falsely stated charge that he had sexually assaulted her.

21. The DSU Police breathalyzer was not working that night so it did not register the fact that Juan Doe was inebriated at the time—something eyewitnesses confirm (Ex. 3).

22. Juan Doe has described how Jane Doe then asked him, the next morning, to conspire with her to lie to the DSU Police:

- "The next day [Jane] sent me a text apologizing for what had happened and telling me that she had "begged them" to leave me alone. She also asked me to return her glasses which she had left behind in the room. We met up at Conrad

Dining Hall where [Jane], again, apologized for what she put me through and plotted to "help" me by claiming it was all a dream, that she dreamt us having sex but that it never actually happened. She wanted me to lie to the Title IX director, which I didn't. I told the truth."  (Ex. 2, Jane's text is Ex. 4).

**C.     Candy Young, DSU's Title IX Investigator, Suppresses Juan Doe's Complaint of Sexual Assault thus Breaching DSU's Contract and Discriminates Against Juan Doe Selectively Enforcing DSU's Policy, Because Juan is a Heterosexual Latino Accusing Jane, a Black Female.**

23.     Every single instance described in this complaint involves Juan Doe, a Latino, interacting with an all black staff at DSU who preferred the complaint of a black woman, Jane Doe, while simultaneously they heard, ignored, and were deliberately indifferent to Juan's detailed sexual assault complaint against Jane.

24.     DSU is under pressure to show it favors females and assumes that females are always the victims (not the perpetrators) of sexual assault.

25.     For example of this pressure, the Trustees and Candy Young are currently named defendants in a case in this Court where Young is accused of preferring a black male, Jason Faustin, over a black female, Mai-ajah Keel, who claimed he sexually assaulted her and gave them notice of the likelihood of sexual assault on DSU's campus.  See, *Keel v. DSU et al*, 1:17-cv-01818-MN, (Amended Complaint, No. 16).

26.     The Keel case suggests that when it comes to implementing Title IX and enforcing sexual misconduct, an event DSU knows will happen, DSU and Ms. Young prefer black men like Faustin over black females' complaints, but not Latino men like Juan facing false complaints from black women like Jane.

27.     Young is the former track coach at DSU and little of her presently known background explains what qualifies her to be DSU's Title IX Investigator and Director.

28.     As part of its promises to Juan Doe, DSU should have staffed this process with personnel that not only trained but who actually undergo a yearly certification.  (Ex. 1).

29.     On information and belief, some or all of the personnel involved here were either not certified, or they acted with malice against Juan, or they ignored their certification, and they were not under DSU's proper supervision.

30.     In the alternative, if the personnel actually were certified, this certification, on information and belief, stemmed from gender-biased methods like "believe her first".

31.     Exhibit 5 evidences DSU's commitment to the "believe her first" hypothesis as it shows DSU's Title IX training is fundamentally biased against men like Juan.

32.     On the very same day that Young informed Juan via a terse email that there was a misconduct complaint against him, he met with her in person.  (Ex. 6).

33.     Young's e-mail, just as every single one of the few other communications that Juan Doe received from DSU, violated Title IX guidance, failed to notify him in a thorough, clear and timely manner of the situation, the facts, the stage of the investigation, its findings, the relevant policy, potential support, and anything else relevant, which is also in breach of DSU's contractual promises of fairness to Juan. (Ex. 1).

34.     During the meeting, Juan Doe told Young that on November 15-16, 2019 he had not assaulted Jane Doe, but to the contrary, that Jane Doe had pursued him, harassed him, gotten him drunk, and pressured him into going to a room alone with her where she proceeded to sexually assault him.  (Ex. 2).

35.     Juan Doe established for Young that not only was he not able to say "no" to Jane Doe more clearly than he did at that time because he was drunk, but also that Jane Doe had forcefully and without his consent stripped his clothes off, performed fellatio on him, and literally guided his body into hers with her hand—over his loud protest that he did not have a condom—because she was sexually assaulting him. (Ex. 2).

36.     Young was deliberately indifferent to Juan Doe's notice of sexual assault, selectively enforced Juan's invocation of DSU's Title IX policy against Jane, and suppressed all of that information from the rest of this process and record.

37.     Young did not do her job, including failing to investigate Juan's charge against Jane as DSU policy demanded she did, nor did she provide Juan with any form of help or support as a victim or respondent of assault in violation of DSU's own contract. (Ex. 1).

38.     Juan Doe provided Young with an exonerating text message which Jane Doe sent to him hours after the incident on November 16, 2019.  In that message Jane Doe asks Juan Doe, in Spanish, to "tell them that nothing happened" and later "I begged them to leave you in peace."  (Ex. 4).

39.     Again, Young ignored the text message, did not investigate it, suppressed it from the investigative file, and thus left out of this process significant evidence, in Jane's own words, of her lack of credibility in this matter.

40.     Similarly, Young suppressed from her investigation Juan Doe told her: that Jane had met with him, and hugged him, on November 16, 2019, which is not what a female victim of sexual assault would do.

41.     Juan Doe asked from Young the video footage from DSU's security cameras that would have captured the encounter when Jane hugged Juan.  Young failed to provide it and DSU continues to ignore Juan's requests for this evidence to date. (Ex. 7).

42.     Thus, Young's investigation turned into a malicious, compressed, sexually and racially biased farce that suppressed all the evidence Young had that Jane assaulted Juan and all the evidence Young had that exonerates Juan violating both Juan's rights under Title IX and his rights to procedural fairness under his contract with DSU.  (Ex. 1).

43.     Evidence of gender and race bias against Juan Doe also includes the fact that Young did not provide Juan with any time to adequately review her investigation, nor did she provide him with any support person in violation of DSU's promises.  (Ex. 1).

44.     It is unknown to Juan Doe whether Young's investigation yielded a formal report or any other form of document of her investigative determination.  If any document of that sort exists, Young did not give Juan Doe an opportunity to inspect it, and certainly Juan Doe never received a copy of it.

45.     Evidence of gender and race bias against Juan Doe includes the fact that Young did not provide Juan Doe with the time to file a response to her investigative report (if any existed) and to the contents or findings of her investigation, if any existed. (Ex. 8).

46.     Juan Doe recalls only seeing that Young's file contained a few documents about what Young decided to include, namely evidence Jane Doe may stated to the DSU police.

47.     The file, as Juan Doe saw it before and during his hearing suppressed all of Juan's evidence and contained no statement from his witnesses.  (Ex. 2, 3, 4).

48.     Evidence of gender and race bias against Juan Doe includes the fact that Young allowed Juan Doe to review the entire file of this matter only hours before Juan appeared

in front of an adjudicative panel (called "ERP Panel 1"). (Ex. 8 is Young's email admitting to her scheduling of this short timed and biased review opportunity).

49.     The inadequate amount of review time Young allowed for Juan left him unable to address the allegations, to present his defenses, and to state as part of the file his complaint of sexual misconduct against Jane Doe to the ERP Panel 1.

50.     Young suppressed from that file the knowledge of the eye-witnesses to the events of November 15-16, 2019 all of whom Juan had identified for Young.  (Ex. 2, 3).

51.     Exhibit 3 has declarations from four eye witnesses that support Juan's claims.

52.     An additional malice indicator is DSU's use of the flawed "single-investigator" model which allowed Young to suppress information and use the ERP Panel 1 to reach the conclusion Young assumed:  That Juan was guilty and Jane was innocent.

53.     The inescapable conclusion from Young's flawed investigative actions—in ignoring Juan Doe's statement that he was sexually assaulted, not Jane, in ignoring his witnesses, and in only placing in the file Jane Doe's story—is that DSU's investigation of the Jane Doe complaint is tainted with a negligently supervised black woman's race and gender biases against Juan and in favor of Jane.

54.     Thus, throughout this investigation DSU acted with malice against Juan Doe because of his race and gender which also breached DSU's promises to Juan Doe.

**D.     DSU Breaches its Contract and Discriminates Against Juan Doe in the Adjudicative Hearing Because he is a Heterosexual Latino.**

55.     On December 6, 2019, Juan Doe appeared before the ERP Panel 1 consisting of three DSU staff, all of whom were black.

56.     ERP Panel 1 received Young's biased and flawed investigative file as Juan had just seen it.

57.     The only other evidence the ERP Panel 1 received to adjudicate Jane's complaint was Juan's statements and answers to the panelist's questions which he stated based on his own story and on his insufficient review of Young's file, hours prior.  (Ex. 9).

58.     Still, Juan presented the ERP Panel 1 with oral notice that Jane Doe had sexually assaulted him and not the other way around.  But they ignored him.  (Ex. 9, 1).

59.     Juan Doe tried to challenge Jane Doe's credibility before the ERP Panel 1—but Jane Doe was not present to respond to the many inconsistencies in her story.

60.     At the time of this hearing, *Doe v. Baum* (903 F.3d 575 (6th Cir. 2018)) had established Juan's right to cross-examine Jane.  At the time of this litigation, this right and many others that support Juan's claims, has become the law of the 3rd Circuit under *Doe v. University of the Sciences* (No. 19-2966 (3d Cir. 2020)).

61.     Young and the ERP Panel 1 violated Juan Doe's rights under these decisions because the investigation and the hearing were ineffective and gender biased.

62.     Juan's witnesses and any support person for Juan were not invited or were not present at this hearing in violation of Title IX guidance from the U.S. Department of Education as well as in breach of DSU's promises to Juan.  (Ex. 1).

63.     Thus, the ERP Panel 1 could not render a real evaluation of the facts in this case.

64.     Further, on information and belief, some if not all of the ERP Panel 1 members were not trained annually as DSU promised Juan they would be.  (Ex. 1).

65.     On this flawed and malicious documentary and procedural record, the ERP Panel 1 found Juan Doe responsible of sexual misconduct and suspended him for one year from his studies at DSU while completely ignoring his complaint against Jane Doe.

66.     Thus, the ERP Panel 1 decision relied on a biased file from an improperly supervised employee, and failed to evaluate dispositive facts like Jane Doe's credibility.

67.     The ERP Panel 1 conduct demonstrates DSU's gender and race bias against Juan Doe and as a result, its decision must be reversed, vacated, and expunged.

**E.      DSU Breaches its Contract and Discriminates Against Juan Doe Denying his Appeal Because he is a Heterosexual Latino.**

68.     Only 24 hours after receiving the ERP Panel 1 decision, Juan, without the help of a lawyer, appealed that decision in writing.  (Ex. 10).

69.     Once again, Young, whose bias had fatally flawed the investigation of Jane Doe's fictional claims, as well as the ERP Panel 1's evaluation of the evidence and the credibility of the parties, was the DSU employee who handled Juan's appeal.

70.     On information and belief, Young's handling of Juan's appeal was both biased against Juan Doe based on his race and gender, as well as retaliatory as Young's handling of Juan's appeal would have dissuaded a reasonable person from filing that appeal.

71.     On information and belief, Young staffed the appeal's panel (called "ERP Panel 2") with all black DSU staff that more than likely were unqualified to serve on this panel.

72.     On information and belief, Juan Doe avers that at least one if not all three members of the ERP Panel 2 were not trained as DSU promised they would be. (Ex. 1).

73.     On information and belief Young in no way cured for the ERP Panel 2 the evidentiary defects that Juan Doe had identified for her and the ERP Panel 1 members.

74.     Thus, even assuming the ERP Panel 2 reviewed any evidence, they did not know about Young's suppression of evidence that either exonerated Juan or convicted Jane.

75.     Similarly, the ERP Panel 2 failed consider the "new evidence" that Juan had claimed, twice at that point to responsible DSU officials, namely, that he was the one who experienced a series of sexual assaults from Jane Doe on November 15-16, 2019.

76.     Thus, the ERP Panel 2 was unable to properly evaluate Juan's appeal.

77.     Evidencing profound gender and race biases, ERP Panel 2 member Sandra Golson, a black woman, justified denying Juan's appeal on his lack of "concern". Yet this is not a recognized appeal reason under DSU's stated policy not to mention it is impossible for Juan, the victim of assault, to express "concern". (Ex. 11).

78.     Golson's use of a subjective, ad-hoc requirement for Juan's appeal is bias and a breach of DSU's promise to Juan that sexual assault is fair and equitable. (Ex. 1).

**F.     A Suspended Juan Doe Gathers the Exonerating Evidence Candy Young Suppressed from the Investigation, the Adjudication, and the Appeal.**

79.     All DSU employees who received notice that Jane Doe had sexually assaulted Juan Doe on November 15-16, 2019 at DSU, in spite of having the power and responsibility to investigate it, acted with deliberate indifference to Juan's notice.

80.     Juan was (and remains) emotionally distraught and in physical pain after his sexual assault and his suspension; events which traumatize him twice—as a victim of sexual assault and racism, and as a falsely accused and maliciously prosecuted respondent to sexual misconduct.

81.     After his suspension, Juan Doe obtained four sworn declarations from the same eyewitnesses that he had identified as part of his exonerating evidence to Young. (Ex. 3).

82.     The declarations prove Juan's factual scenario where Jane attended a party where she knew no one, proceeded to get Juan drunk, to take him to a bedroom, and assault him.

83.     The declarations demolish Jane's credibility—particularly because they document her actions after her false claim of assault, which included asking DSU students to conspire with her in lying to DSU police and to Young.  (Ex. 3).

84.     None of the ERP Panels considered the reliable factual scenario stated in these declarations because Young suppressed this evidence, even though she knew of it, and had a duty to document it under DSU's promise of a "thorough" investigation.  (Ex. 1).

85.     Juan Doe provided these declarations to relevant DSU officials as soon as he obtained them.  These officials were similarly deliberately indifferent to their facts.

86.     After his suspension Juan Doe requested that DSU provide him with specific segments of the DSU security footage that show contradictions in Jane Doe's claim like Jane Doe hugging both Juan Doe and Student No. 1 after the night when she falsely claimed she was the victim, and not the perpetrator, of sexual misconduct. (Ex. 7).

87.     DSU did not deign it necessary to respond to this request.

**G.     A Suspended Juan Doe Files a Sexual Misconduct Complaint Against Jane Doe and Seeks Re-instatement Which DSU Denies with Deliberate Indifference.**

88.     On June 6, 2020, after DSU denied his appeal, Juan filed a sexual misconduct complaint against Jane Doe and Young with DSU's Title IX office.  (Ex. 2).

89.     That complaint is supported with declarations of the four eye witnesses stating the information which Young suppressed from the investigation of Jane's complaint.  (Ex. 3).

90.     DSU claims to have investigated and evaluated the matter.

91.     Consistent with its pattern of gender and race based malice against Juan Doe, this time DSU found that there was not enough evidence to conclude that a policy violation had taken place when Jane assaulted Juan on November 15, 2019.  (Ex. 12).

92.     Most disturbingly, as evidence of DSU's gender malice against Juan, DSU's finding baldly states a falsehood.  DSU bases its denial of Juan Doe's claim against Jane Doe and Young based on lack of evidence including falsely stating that Juan's witnesses "opted not to attend the scheduled interview." (Ex. 12).

93.     Those same four witnesses have now stated under oath that they did not refuse to participate in the investigation of Juan Doe's charge at all.  Rather, DSU never interviewed them after they agreed to cooperate with the investigation. (Ex. 13).

94.     In further evidence of DSU's malice against Juan Doe and those who share either his national origin or his gender, DSU discounted all the evidence in Exhibit 3, which comes from all four of Juan's witnesses who are Latino, and two of whom are men.

95.     DSU admitted that Jane Doe did not participate in this investigation.

96.     Thus, DSU has continued its malice and deliberate indifference to Juan's claim and has continued to harm him, particularly by making him unable to register for courses and pursue the dream of his education at DSU or elsewhere.

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violation of Title IX--Reverse Discrimination

97.     Plaintiff incorporates the paragraphs above as if fully set forth herein.

98.     This action seems to be the first filing in Delaware District Court after the Third Circuit's seminal decision in student sexual misconduct, *Doe v. University of The*

*Sciences* (No. 19-2966 (3d Cir. 2020) which guarantees a panoply of rights for Juan Doe, all of which DSU violated, including the right to a hearing during which he was entitled to cross-examine Jane Doe, the use of non-biased investigative models unlike the "single investigator" model DSU used here, and the right to not have his story consistently discredited and to have Jane's story consistently credited.

99.     Under *USciences*, Juan Doe needs to plead, as he has done here with exactitude, "alleged facts that if true, must support a plausible inference that ...[DSU]…discriminated against a person on the basis of sex."

100.    Under *USciences* Juan Doe has also pled that his sex was a motivating factor in DSU's investigation and decision to discipline him.

101.    In addition, the Third Circuit allows Juan Doe to plead upon information and belief, as he has done here, where information is in defendant's sole control, "so long as [plaintiff] does not rely on boilerplate and conclusory allegations and he accompanies his legal theory with allegations that make his theoretically viable claim plausible." *McDermott v. Clondalkin Group Inc*., 649 F. App'x 263, 268 (3d Cir. 2016).

102.    None of Juan Doe's allegations are boiler plate and all include detailed averments with supporting declarations from eye-witnesses that take the complaint well beyond plausibility of gender and race bias as motivating factor for DSU and Young's conduct.

103.    At the complaint stage, Juan is entitled to the presumption that DSU treats male respondents who are Latino worse than it treats black female complainants (or respondents) like Jane Doe, that DSU selectively enforces sexual misconduct against men only, that the investigation was not fair, that Young is under personal pressure to appear to enforce Title IX against men, that the members of the ERP Panels 1 and 2 saw

incomplete files, that every staff member involved here was negligently hired or supervised, and most likely that they were not properly trained or certified.

104.    Juan's averments of Young's evidence suppression and indifference to Juan's claims against Jane state the type of selective enforcement and investigation male bias now forbidden under *USciences*, just as they suggest error flawed the handling as well as on the outcome of this investigation because of defendants' gender biases against Juan.

105.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, et seq. ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

106.    DSU cannot deny it receives extensive federal funding as a public school. Title IX is enforceable through an implied private right of action affording an individual discriminated against due to his gender damages and equitable relief.

107.    At the time of the events relevant to this complaint the Department of Education had promulgated interim regulations under Title IX.  Plaintiff has identified for DSU no less than 12 instances where Young violated that interim guidance which also makes it reasonable to assume Young's gender bias against Juan caused the violations. (Ex. 14).

108.    Thus, defendant DSU has deprived Plaintiff on the basis of his sex of his Title IX rights, of his statutory due process rights, and to equal protection through the improper, malicious, sex-based application of its policies for handling sexual assault which led to an erroneous outcome, to selective enforcement and in the case of plaintiff's sexual assault complaints, to DSU's deliberate indifference to his double victimization.

109.   Young's implementation of DSU's policies and procedures have deprived Plaintiff, on the basis of his sex, of the right to a thorough charge, to an investigation and to a fair resolution requiring the cross examination and prosecution of Jane Doe.

110.   Due to Plaintiff's gender, DSU sanctioned Plaintiff excessively severely and to the benefit of Jane Doe because of her sex, thus in violation of Title IX.

111.   As a direct and proximate consequence of DSU's Title IX violations, Plaintiff has sustained significant damages including suspension from DSU which is irreparable harm.

112.   Plaintiff has also suffered monetary damages, profound emotional distress, loss of educational opportunities, and other direct and consequential damages including pain and suffering as well as significant legal fees.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against DSU and provide the following relief:

(a)   Mandate that DSU correct Plaintiff's academic and/or disciplinary record to remove any findings issued by the University with respect to all the charges levied against him by DSU and/or Jane Doe which led to his suspension and to his disciplinary record;

(b)   Mandate that DSU verify this correction by providing Plaintiff with a notarized letter confirming that any findings with respect to these charges have been expunged from Plaintiff's academic and/or disciplinary record;

(c)   Mandate that DSU immediately allow Plaintiff to re-enroll in the University to complete his education with credit for the few courses Plaintiff has taken to date as sought in Plaintiff's injunction proceedings;

(d)      Award Plaintiff compensatory damages, in addition to attorneys' fees, expenses and costs; and

(e)      Award Plaintiff any other and further relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION

## Violation of Title IX--Deliberate Indifference to Plaintiff's Sexual Assault and Sexual Hostility Reports.

113.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

114.    From the start, DSU was on notice of, and was deliberately indifferent to plaintiff's initial reports that Jane Doe sexually assaulted him on the night of November 15-16, 2019.

115.    Serious flaws in DSU's investigation and adjudication, including their lack of equity and fairness, and the gender bias in favor of females, poisoned the process.

116.    As a result the DSU officials in charge of protecting plaintiff, including Young and the ERP 1 panelists, once aware of plaintiff's claim that Jane Doe sexually assaulted him and created a sexually hostile academic environment for him, chose to ignore his complaint, failing to protect him, and favoring Jane Doe, because she is black woman.

117.    DSU's lax, biased, and bad faith application of the procedures in Exhibit 1, which Juan Doe invoked against Jane Doe, was motivated by and premised on DSU's deliberate indifference to sexual misconduct complaints from a heterosexual Latino like plaintiff which he clearly and specifically levied against a black female like Jane Doe.

118.    The fact that DSU's own policy in Exhibit 1 guaranteed a support staff for Juan

Doe, which Young never offered at all, is evidence that DSU discriminated against

Plaintiff with deliberate indifference to his rape experience and report.

119.    Young had not just the duty but also the power to investigate Juan Doe's claims

against Jane Doe and to protect him from her.  She chose not to do so.  Instead she chose

to suppress all this information from the file in deliberate indifference to his safety.

120.    DSU's subsequent determination that there is no evidence to support Juan's

claims against Jane is based on falsehoods and on gender motivated malice. (Ex. 13).

121.    At all times, DSU's conduct was so severe, pervasive, and objectively offensive

that it denied the Plaintiff equal access to education that Title IX is designed to protect.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment

in his favor against DSU and provide the following relief:

(a)    Mandate that DSU correct Plaintiff's academic and/or disciplinary record

to remove any findings issued by the University with respect to all the charges

levied by Jane Doe against him;

(b)    Mandate that DSU open an independent investigation of Juan's claims of

sexual assault against Jane Doe;

(c)    Mandate that DSU verify these corrections by providing Plaintiff with a

notarized letter confirming that any mention of these charges have been expunged

from Plaintiff's record and have been marked on Jane Doe's record instead;

(d)    Mandate that DSU immediately allow Plaintiff to re-enroll in the

University to complete his education with credit for the few courses Plaintiff has

taken to date as argued in plaintiff's injunction;

(e)      Award Plaintiff compensatory damages, in addition to attorneys' fees, expenses and costs; and

(f)      Award Plaintiff any other and further relief that the Court deems just and proper.

**THIRD CAUSE OF ACTION**

**Violation of Title VI**

122.      Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

123.      Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq et seq. ("Title VI"), provides in relevant part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

124.      Based on the foregoing averments of fact, defendant DSU has deprived Plaintiff on the basis of his race (Latino) and national origin (Mexican) of his rights to due process and to equal protection through the improper, malicious, racist, selective, or deliberately indifferent application of its policies for handling complaints of sexual assault against and by him at a historically black institution of higher learning that receives federal funds.

125.      DSU has discriminated against Plaintiff on the basis of his race and national origin, through discriminatory, race-based implementation of the policies in Exhibit 1 at the investigative, adjudicative and appellate phases of these claims.

126.      The public record of DSU's conduct to date suggests these race biases.  The fact that Young ignored a Latino student's complaint against Jane Doe, a black woman, shows this.  Data only DSU has, but which is the basis of the Keel litigation (*Keel v. DSU*

*et al*, 1:17-cv-01818-MN), demonstrates the likelihood that comparators, black male DSU students also accused of assault like Faustin, and in the case of those rare black females who should have been charged with assault, like Jane Doe, are treated better by Young and are not disciplined by DSU because of their race.

137.    DSU has violated Plaintiff's rights to be free from race based discrimination under Title VI of the Civil Rights Act of 1964 including, as provided under 20 CFR Sec. 42.101 et seq., at 42.104.(b) by:

      (i) Denying Plaintiff services given to other students.

      (ii)  Giving Plaintiff different services than those given to the other students.

      (iii) Segregating and treating Plaintiff separately from the other students.

      (iv) Treating Plaintiff differently from other students, including those black males like Faustin facing, or who should have been charged with violations of DSU's sexual assault policy, and those black females like Jane Doe who should have been charged with violations of DSU sexual assault policy.

      (v) Denying Plaintiff's ability to participate in DSU programs including ancillary academic activities like the sports facilities and social spaces.

138.    DSU initiated and conducted the charge, investigation, and subsequent hearing of Jane Doe's complaint in a manner that was biased against Plaintiff due to his race and national origin to the benefit of those like Jane Doe whose race matches Young's.

139.    Plaintiff avers inaccuracies that cast doubt on the initial charge of misconduct, in the investigation of that charge, and in the assignment of discipline stemming from that charge which suggest a racial bias against plaintiff by an all black DSU staff.

140.     All of these race motivated actions violate DSU's contract with Plaintiff, federal guidelines on race and education, and demonstrate defendant's race-motivated discriminatory bias against Plaintiff, in violation of Title VI.

141.     The racial and national discrimination which Plaintiff seeks to redress constituted exclusion from participation in federally funded matters; practices which are made unlawful by Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d.

142.     As a direct and proximate result of Defendants' unlawful exclusionary practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has been deprived of economic and non-economic benefits including, but not limited to inability to study and to finish his studies, wage loss, failure to grow academically and professionally, pain and suffering, mental anguish, humiliation, loss of fringe benefits, painful embarrassment among his friends and peers, disruption of his personal life and loss of enjoyment of life.

143.     These acts were willful, wanton, malicious and oppressive and done with reckless disregard for Plaintiff's federally protected rights to not be discriminated against because of his race, therefore justifying the imposition of punitive damages.

**WHEREFORE,** As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements.  Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against DSU and provide the relief requested in the first cause of action as well as to enter any equitable relief that this court may deem proper.

## FOURTH CAUSE OF ACTION

### Violation of Section 1981 of the Civil Rights Act

144.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

145.    Plaintiff is a male of color, of Latino race, and Mexican national origin who had a contract with DSU to obtain education, to be protected from racial and sexual harassment both as complainant and respondent, and to receive housing.

146.    42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. It prohibits racial discrimination against whites as well as nonwhites. See *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976) (Section 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). And see *Runyon v. McCrary*, 427 U.S. 160 (1976), where the Supreme Court held that Section 1981 regulates private conduct and governmental action.

147.    In violation of its own contract and policy, DSU investigated, evaluated and suspended Plaintiff based on an inherently false complaint from Jane Doe, herself a black complainant, while completely ignoring Plaintiff's complaint of significantly worse acts that Jane Doe victimized him with. In that process DSU suppressed evidence and applied different standards for Plaintiff and to Jane Doe, benefiting her because of DSU's intentional animosity towards his race including assuming his guilt.

148.    DSU, on information and belief, treats non-Latino respondents to disciplinary processes like this one better than it treated plaintiff who as a Latino is entitled, under Third Circuit law, to plead this claim at the complaint stage in the alternative, citing to comparators on information and belief, which include Faustin--the black male respondent identified in litigation in this Court (*Keel v. DSU et al*, 1:17-cv-01818-MN).

149.    In all these investigations and determinations DSU treated Plaintiff in a discriminatory manner that violated DSU's contract due to a racial motivation.

150.    Plaintiff's race and national origin were motivating factors in DSU's handling of the sexual assault complaint from Jane Doe, a black female, which led to Plaintiff's suspension and expulsion all the while ignoring and undermining plaintiff's complaints against that same Jane Doe because he is Latino.

**WHEREFORE,** As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements as well as to punitive damages.  Plaintiff requests that this Honorable Court enter judgment in his favor against DSU and provide the relief requested in the first cause of action and requests any other equitable relief that this court may deem proper to ensure that Plaintiff is not discriminated against on the basis of his race and or their national origin

### **FIFTH CAUSE OF ACTION**

### **Candy Young's Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution Pursuant to 42 U.S.C. § 1983**

151.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

152.    At all times relevant herein, Defendant Young acted under the color of state law, under color of her authority as agent, representative, or employee of DSU and within the scope of her employment with DSU.

153.    Defendant Young's anti-male bias, her anti-Latino bias, and her deliberate indifference to Juan Doe's sexual assault victimization, as well as Young's willful and wanton behavior, created a danger of and increased the risk of harm to Plaintiff.

154.    Defendant Young's conduct was intentional, and motivated by gender and/or race.

155.    Defendant Young violated Plaintiff's civil rights by suppressing evidence and selectively enforcing DSU's sexual misconduct policy that caused a constitutional deprivation to Plaintiff.

156.    Defendant Young also violated Plaintiff's equal protection rights by ignoring his complaint of sexual misconduct against Jane Doe, a black woman. This selective enforcement seems to be a widespread practice and/or custom of Young's that, although not authorized by written law or express DSU policy, is so permanent and well settled as to constitute a custom or usage of selective enforcement with the force of law.

157.    Defendant Young knew about the above-described conduct and implemented it, facilitated it, approved it, condoned it, and/or turned a blind eye to the conduct.

158.    The above-described conduct of Defendant Young constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

159.    Plaintiff is entitled to compensatory damages for physical injury, emotional pain, suffering, mental anguish and other non-pecuniary losses.

**WHEREFORE,** As a result, Plaintiff is entitled to damages from Young in an amount to be determined at trial, to punitive damages, costs, interest, statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

### SIXTH CAUSE OF ACTION

### Breach of Contract

160.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

161.    At all times relevant hereto, a contractual relationship existed between DSU and Plaintiff through, inter alia, DSU's "Policies and Procedures: Equal Opportunity, Harassment and Non-discrimination". (Ex. 1).

162.    DSU was required to act in accordance with that contract.

163.    For all the reasons set forth above, DSU has materially breached its contracts with Plaintiff by failing to comply with policies and procedures governing sexual misconduct and racial discrimination in a gender and race bias free manner as promised in Exhibit 1.

164.    As a direct, proximate and foreseeable consequence of DSU's numerous material breaches, Plaintiff has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) indicating that he was found to have committed sexual misconduct when he did no such thing.

165.    Plaintiff was also suspended from DSU as a consequence of these breaches with a resulting loss of lifetime earnings, loss of education opportunities, defamation, pain and suffering, and other direct and consequential damages.

166.    Plaintiff was also sexually assaulted by Jane Doe, and then victimized at and by DSU as a consequence of its contractual breaches, for example when Young chose to ignore Juan's claim against Jane, and when Young chose to not interview Juan's witnesses, with a resulting loss of lifetime earnings, loss of education opportunities, defamation, pain and suffering, and other direct and consequential damages.

167.    Plaintiff is entitled to recover damages for DSU's breach of its contractual obligations and duties of fairness including specific performance of the contract.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in his favor against DSU and provide the relief requested in the first cause of action and any further

relief this court may deem just and proper including specific performance and any other equitable relief.

## SEVENTH CAUSE OF ACTION

### Delaware Deceptive Trade Practices Act

168.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

169.    The Delaware Deceptive Trade Practices Act (DTPA), Del. C. tit. 6, §§ 2532(a)(2), (5), (8) & (12), creates a private right of action for consumers of Delaware-based services, such as Plaintiff's consumption of DSU's educational services, whose characteristics have been misrepresented or is likely to  mislead or be misunderstood."

170.    Under the DPTA Juan Doe, as a consumer of educational services who chose DSU based on its offers to him as a provider of educational services of "fairness and equity" (Ex. 1), is entitled to protection from the unfair, deceptive, fraudulent, unconscionable trade and business practices, as well as from the false advertising contained in those promises he received from DSU.

171.    It is unfair, deceptive, fraudulent, and unconscionable to advertise DSU as a gender and race discrimination free environment, where complaints are investigated "thoroughly" (Ex. 1) and where everything is handled with a commitment to "fairness and equity" (Ex. 1) because DSU did not provide any of that for Juan.

172.    Defendant DSU has engaged in acts and practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large including Juan Doe, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances because they create the likelihood of confusion and misunderstanding:

    a.      by causing Plaintiff to believe that DSU would follow its policies in Exhibit 1, and other materials,

    b.      by causing Plaintiff to believe that if he accepted DSU's offer of enrollment, DSU would uphold its obligations, covenants and warranties to Plaintiff as described in its policies including those in Exhibit 1.

173.    Defendant DSU had no intention of following and in fact did not follow its own policies and procedures, nor did it uphold its obligations for Plaintiff's disciplinary actions, or for his complaints of misconduct against Jane Doe.

174.    It is particularly deceptive for DSU to have taken Jane Doe's spurious allegations at face value, while DSU ignored the notice that Jane Doe sexually assaulted plaintiff, in the context of DSU's promise of "fairness and equity" and non-discrimination based on gender or race or national origin.  (Ex. 1).

175.    Based on the foregoing defendant DSU engaged in deceptive trade practices in violation of the DTPA.

176.    As a direct, proximate and readily foreseeable consequence of DSU's aforementioned conduct in violation of the DTPA, Plaintiff has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation of sexual misconduct which irreparably harms Juan for the rest of his life and ends his career before it even started.

177.    Plaintiff has also suffered monetary damages, emotional distress, pain and suffering, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, requests that this Honorable Court enter judgment in his favor against DSU and provide the relief requested in the first cause of action, any additional

damages allowed under the DTPA, attorney's fees as allowed under the DTPA and any further relief this court may deem just and proper including a finding that DSU induced Plaintiff to rely on its promises to achieve his enrollment and any other equitable relief.

## EIGHT CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

178.   Plaintiff incorporates each of the above paragraphs as if fully set forth herein. At all times relevant to this claim, plaintiff was in a zone of immediate danger to all of the defendants' negligent acts stated in this complaint, including the DSU campus.

179.   Plaintiff suffered physical injury as a result of the defendants' conduct as described in this complaint including headaches, weight loss, anxiety, sleep loss, weakness, shaking, and other symptoms to be established at trial.

180.   At all times and in all events relevant to this claim, defendants' conduct was outrageous in character and extreme in degree including:

(i)  Ignoring the plaintiff's report that AC had sexually assaulted him.

(ii)  Selectively enforcing DSU policy against plaintiff only.

(iii)  Convicting the plaintiff on a falsely stated claim of an absent complainant.

(iv)  Denying the plaintiff's appeal on ad-hoc grounds by inept staff

(v)  Suspending the plaintiff and not AC.

(vi)  Eventually listening to plaintiff's claim against AC and dismissing this claim based on the false statement that plaintiff's witnesses did not cooperate with the investigation (Ex. 13, and Ex. 12).

181.   Defendants' conduct as stated in this complaint goes beyond what civilized community tolerates, as it allegedly constitutes discrimination on two bases: Gender on

the one hand saying it is not a problem for women to rape men, and race, saying on the other hand that it is not a problem for black women to falsely state claims against Latinos.

182.    The defendants' violation of plaintiff's rights to a sex-bias free educational environment was so beyond the rules of our civilized community, that plaintiff has alleged it violated several instances of the DOE's applicable regulations.

183.    As a result of defendants' conduct, plaintiff suffered, and continues to suffer, distress so severe that no reasonable person could be expected to endure it.

184.    As a direct, proximate and readily foreseeable consequence of DSU's outrageous and extreme conduct, Plaintiff has sustained significant damages including, but not limited to, suspension, humiliation, possessing an academic and/or disciplinary record(s) that derails his career and improperly includes a notation of sexual misconduct which makes Juan suffer for the rest of his life including causing him ongoing physical pain.

185.    Plaintiff has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, requests that this Honorable Court enter judgment in his favor against DSU and provide the relief requested in the first cause of action, any additional damages allowed for negligent infliction of emotional distress, and any further relief this court may deem just and proper.

## NINTH CAUSE OF ACTION

### Negligent Hiring

186.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

187.    At all times relevant to this claim, defendant DSU provided at least two types of employees meant to protect the plaintiff—a Title IX office, and a private police force.

188.    At all times relevant to this claim, defendant DSU supervised these two offices'

staff as well as any other employee that may have taken part in the events stated in this

complaint.

189.    At all times relevant to this claim, defendant DSU failed to properly provide

procedures, orders, or to otherwise supervise or train at least some if not all of the

employees involved in the events stated in this complaint, including those in the Title IX

office, those in the ERP panels, and those in DSU's private police force.

190.    At all times relevant to this complaint, DSU was on notice that it needed to

exercise control over these employees.  Indeed, DSU promised to do so as concerns

sexual assault on campus, and negligently failed to do so.

191.    Under applicable DOE regulations, DSU knew and knows it has an obligation to

exercise control over any and every employee involved in a Title IX matter.

192.    As a result of DSU's failure to properly hire, supervise, train, or control, these

employees and possibly several others committed torts against the plaintiff and also

committed other violations of plaintiff's constitutional and state law rights as stated in

this complaint.

193.    Simply stated, had DSU properly hired, trained, or supervised the employees

involved in this complaint AC would have been suspended, not plaintiff.

194.    As a direct, proximate and readily foreseeable consequence of DSU's failure to

hire, train, or supervise these staff, Plaintiff has sustained significant damages including,

but not limited to possessing an academic and/or disciplinary record(s) that improperly

includes a notation of sexual misconduct which irreparably harms Juan for the rest of his

life and ends his career before it even started, while causing him deep emotional and physical pain.

195.    Plaintiff has suffered monetary damages, diminished earnings capacity, emotional distress, pain and suffering, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, requests that this Honorable Court enter judgment in his favor against DSU and provide the relief requested in the first cause of action, any additional damages allowed for negligent hiring, and any further relief this court may deem just and proper.

## TENTH CAUSE OF ACTION

### Premises Liability for Third Party Criminal Activity

196.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

197.    Section 344(f) of the Restatement (Second) of Torts states that the possessor of land is generally under no duty to police their land until he or she "knows or has reason to know that the acts of the third person are occurring, or are about to occur." Restatement (Second) of Torts § 344(f) (1965). Knowledge may be inferred from past experiences. Id.

198.    Because of its duty under Title IX regulations from DOE, at all times relevant to this claim, DSU knew there is a risk that sexual assault on its campus was about to occur.

199.    At all times relevant to this claim, defendant DSU knew or had reason to know that the criminal acts of third persons, just as those that plaintiff alleges in this complaint that AC committed against him, are occurring or are about to occur.

200.    Particularly, DSU's knowledge of sexual assault on its campus may be inferred from its past experiences some of which are detailed in another lawsuit in this Court against the same defendants:  *Keel v. DSU et al*, id no. 25.

201.    DSU also undertook the security responsibility of those in its campus, including plaintiff, through the establishment and supervision of a private campus police force which requires DSU to protect visitors and plaintiff against harm.

202.    The fact that DSU maintains a private police force also infers DSU's knowledge of past and potentially future criminal activity on its premises.

203.    Plaintiff alleges that he was a tenant at a DSU dormitory.

204.    Plaintiff alleges that AC sexually assaulted him at his DSU dormitory.

205.    Plaintiff alleges that AC's acts are criminal activity against his person, in the DSU campus, and that DSU knew or should have known plaintiff needed protection from this activity.

206.    Plaintiff alleges that DSU failed to provide him with any of this protection both through its Title IX office and through its private police force, among others.

207.    Thus, DSU's negligence in protecting plaintiff from sexual assault is the proximate cause of his injury, in terms of being the victim of AC's sexual assault, as stated in this complaint particularly because DSU had control over both the dormitory and AC, an enrolled student.

208.    DSU, in spite of this dual control over the premises and the alleged perpetrator, including video camera footage of plaintiff's dorm and its police station showing AC's acts, still did not exercise any control over either premises or AC, which led to the plaintiff's injury.

209.    As a result of DSU's failure to protect the plaintiff from AC's criminal activity in DSU's campus, DSU was the proximate cause of plaintiff's injuries.

210.    As a direct, proximate and readily foreseeable consequence of DSU's failure to protect the Plaintiff, he has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation of sexual misconduct which irreparably harms Juan for the rest of his life and ends his career before it even started

211.    Plaintiff has also suffered monetary damages, emotional distress, pain and suffering, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, requests that this Honorable Court enter judgment in his favor against DSU and provide the relief requested in the first cause of action, any additional damages allowed for premises liability stemming from the criminal activity of a third party, and any further relief this court may deem just and proper.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against DSU in compensation in an amount to be determined at trial, in addition to pre-judgment interest, attorneys' fees, expenses, costs, disbursements, and any other further relief the Court deems just and proper including equitable relief.

Respectfully submitted,

/s/   Jimmy Chong, Esq.

/s/ Raul Jauregui, Esq.
Pending pro-hac vice admission

Jimmy Chong, Esquire
Chong Law Firm
2961 Centerville Road, Suite 350
Wilmington, DE 19808
(302) 999-9480

Raul Jauregui, Esquire
Jauregui Law Firm
720 Arch Street, PO Box 861
Philadelphia, PA 19107
(215) 559-9285

Chong@Chonglawfirm.com                    RJ@RaulJauregui.com
www.chonglawfirm.com                      www.studentmisconduct.com


                           Attorneys for Plaintiff

Dated:  November 16, 2020.